**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LARRY C. BRADLEY, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case No. 4:10CV 1998 LMB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Larry C. Bradley, Jr. for Supplemental Security Income under Title XVI of the Social Security Act.  This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties.  See 28 U.S.C. § 636(c).  Plaintiff has filed a Brief in Support of the Complaint. (Document Number 13).  Defendant has filed a Brief in Support of the Answer.  (Doc. No. 16). Plaintiff has filed a Reply.  (Doc. No. 17).

**Procedural History**

On January 7, 2009, plaintiff filed his application for benefits, claiming that he became unable to work due to his disabling condition on December 30, 1986.[1]  (Tr. 99-101).  This claim

---

[1]In a letter dated September 23, 2009, plaintiff's attorney indicated that plaintiff was amending his alleged onset date of disability to December 30, 2008.  (Tr. 110).

- 1 -

was denied initially, and following an administrative hearing, plaintiff's claim was denied in a

written opinion by an Administrative Law Judge (ALJ), dated December 23, 2009.  (Tr. 74-80,

10-22).  On August 27, 2010, the Appeals Council denied plaintiff's request for review.  (Tr. 1-

5).   Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20

C.F.R. §§ 404.981, 416.1481.

## **Evidence Before the ALJ**

A.      **ALJ Hearing**

        Plaintiff's administrative hearing was held on November 10, 2009.  (Tr. 29).  Plaintiff was

present and was represented by counsel.  (Id.).  A vocational expert was also present.  (Id.).

        The ALJ examined plaintiff, who testified that he was thirty-four years of age, and was a

high school graduate.  (Tr. 30).  Plaintiff stated that he was taking twelve hours of classes at a

community college at the time of the hearing, and that this was his first semester.  (Tr. 30).

        Plaintiff testified that he served twelve years and one month in prison for convictions of

first-degree assault, armed criminal action, and unlawful use of weapon.  (Id.).  Plaintiff stated

that he was released from prison on November 20, 2008.  (Id.).  Plaintiff testified that he has

completed his parole and his sentence was finalized in October of 2009.  (Tr. 32).

        Plaintiff stated that he has worked in the past, but he has never stayed at a position for six

months or longer.  (Tr. 30).  Plaintiff testified that he has looked for work since his release from

prison, but he never received a response.  (Id.).

        Plaintiff stated that he has not used any street drugs since his release from prison.  (Tr.

31).  Plaintiff testified that he learned when he was twelve years old that drugs worsened his

mental condition so he has avoided using drugs.  (Id.).  Plaintiff stated that he was not aware of

- 2 -

any positive drug tests.  (Id.).

Plaintiff testified that he was required to receive psychiatric treatment for his depression as a condition of his parole.  (Tr. 32).  Plaintiff stated that he saw Dr. Loon-Tzian Lo when he was on parole, and that he continues to see Dr. Lo.  (Tr. 31).  Plaintiff testified that he last saw Dr. Lo one month prior to the hearing, and that he had an appointment to see her a few weeks after the hearing.  (Id.).  Plaintiff testified that he continued to see Dr. Lo for psychiatric treatment because he had a family history of mental illness and he wanted help understanding why he made the decisions that led to his incarceration.  (Tr. 33).

Plaintiff stated that Marquita Johnson was his parole officer, although he was no longer on parole at the time of the hearing.  (Tr. 32).  Plaintiff testified that he was required to undergo drug testing as a condition of his parole, and that he underwent drug testing on one occasion.  (Id.).  Plaintiff stated that Ms. Johnson confirmed that his test was negative.  (Id.).

Plaintiff testified that he initially believed he was physically and mentally capable of working, but his performance in school has made him question his ability to work.  (Tr. 33).  Plaintiff stated that he was not doing well in school because he was unable to control his thoughts and mood enough to focus.  (Id.).  Plaintiff testified that he did not believe he could perform a manual-type job because he was too distracted to work at a reasonable pace.  (Tr. 34).

Plaintiff's attorney then examined plaintiff, who testified that he has been unable to attend all of his classes because he is not motivated enough to arrive at class on time.  (Id.).  Plaintiff stated that when he does attend class, he is usually at least thirty minutes late.  (Id.).  Plaintiff testified that he had difficulty controlling his thoughts and feelings.  (Tr. 35).  Plaintiff stated that he had mood swings.  (Id.).  Plaintiff testified that he became anxious and agitated and

somewhat volatile.  (Id.).  Plaintiff stated that when he is in a volatile mood, his reasoning begins

to shut down and he tends to "freeze up."  (Id.).  Plaintiff testified that since he completed anger

management classes, he has learned to maintain his composure and not respond inappropriately.

(Id.).  Plaintiff stated that when he freezes up, his heart rate elevates, he becomes nervous and

anxious, and he sweats.  (Id.).  Plaintiff testified that he occasionally became agitated and forgets

that he is out of prison.  (Id.).

Plaintiff stated that he had difficulty sleeping, although he slept better when he took

Trazodone.[2]  (Tr. 36).  Plaintiff testified that he has always had difficulty falling asleep at night.

(Id.).  Plaintiff stated that he also had problems staying asleep and that he had night terrors.  (Id.).

Plaintiff testified that he took 100 mg. of Prozac.[3]  (Id.).  Plaintiff stated that Dr. Lo told

him that this dosage was above the FDA-approved dosage, and that she may supplement it with

Wellbutrin.[4]  (Tr. 37).

The ALJ next examined the vocational expert, who testified that plaintiff had no past jobs

at the substantial gainful activity level.  (Id.).  The ALJ asked the vocational expert to assume a

hypothetical claimant with plaintiff's background and the following limitations: no physical

restrictions; capable of understanding, remembering and carrying out at least simple to moderately

complex instructions and tasks; capable of demonstrating adequate judgment to make simple,

work-related decisions; capable of responding appropriately to supervisors and co-workers in a

---

[2]Trazodone is an antidepressant indicate for the treatment of depression.  See WebMD, http://www.webmd.com/drugs (last visited February 7, 2012).

[3]Prozac is indicated for the treatment of major depressive disorder.  See Physician's Desk Reference (PDR), 1854 (63rd Ed. 2009).

[4]Wellbutrin is indicated for the treatment of major depressive disorder.  See PDR at 1649.

task-oriented setting where contact with others is casual and infrequent; and should not work in a

setting which includes constant or regular contact with the general public.  (Tr. 38).  The

vocational expert testified that the individual would be capable of performing medium, unskilled

work, such as automobile detailer (336,210 positions nationally, 8,910 positions in Missouri); and

industrial cleaner (2,112,870 positions nationally, 43,290 positions in Missouri).  (Id.).

The ALJ next asked the vocational expert to assume a hypothetical claimant with the

following limitations: marked limitation in the ability to cope with normal stress, maintain

reliability, maintain attention and concentration for extended periods, perform at a consistent pace

without an unreasonable number and length of breaks, sustain an ordinary routine without special

supervision, and respond to changes in the work setting.  (Tr. 39).  The vocational expert testified

that there would not be work for such an individual.  (Id.).

## B.    **Relevant Medical Records**

The  record  reveals  that  plaintiff  received  treatment  for  diagnoses  of  major  depressive

disorder;[5] mood disorder, not otherwise specified; and borderline personality disorder[6] through the

Missouri Department of Corrections from January 2000 through his release in November 2008.  (Tr.

180-267).  Plaintiff was prescribed medication, including Prozac and Trazodone.  (Id.).

Plaintiff presented to Sarah Bauer, MA, LPC, at BJC Behavioral Health on January 14, 2009,

---

[5]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and
appetite disturbances, and feelings of worthlessness, guilt, and hopelessness.  Stedman's Medical
Dictionary, 515 (28th Ed. 2006).

[6]An enduring and pervasive pattern that begins by early adulthood and is characterized by
impulsivity and unpredictability, unstable interpersonal relationships, inappropriate or uncontrolled
affect, especially anger, identity disturbances, rapid shifts of mood, suicidal acts, self-mutilation,
job and marital instability, chronic feelings of emptiness or boredom, and intolerance of being
alone.  Stedman's at 568.

for an initial assessment. (Tr. 347-60). Plaintiff reported symptoms of anxiety, "extreme frustration," pacing, difficulty concentrating, lethergy, depression, and difficulty sleeping. (Tr. 347). Plaintiff also reported a history of difficulty controlling his anger. (Id.). Plaintiff had run out of his medication the previous month. (Id.). Plaintiff reported that he had read that substance use and alcohol can worsen mental health symptoms so he decided early on not to drink or use drugs. (Tr. 349). It was noted that plaintiff's urine toxin screen was positive for Cannabis use. (Id.). Plaintiff reported that he would like to get back to work, but the process of locating a job felt overwhelming. (Id.). Upon mental status examination, plaintiff was polite and cooperative, intelligent, soft-spoken, and articulate. (Tr. 356). Plaintiff's flow of thought and thought content were normal, and his affect was somewhat flat. (Id.). Plaintiff described his mood as "extremely depressed." (Id.). Ms. Bauer diagnosed plaintiff with major depressive disorder, recurrent; marijuana use; and a GAF[7] score of 53.[8] (Tr. 358).

On February 9, 2009, plaintiff saw psychiatrist Loon-Tzian Lo, at BJC Behavioral Health for a psychiatric evaluation. (Tr. 372-74). Plaintiff reported a history of major depressive disorder since age twelve. (Tr. 372). Plaintiff had no prior psychiatric hospitalizations. (Id.). Plaintiff denied drug use, although Dr. Lo noted that plaintiff tested positive for marijuana at his initial evaluation. (Id.). Upon mental status examination, Dr. Lo found that plaintiff was soft-spoken, cooperative, and had

---

[7]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[8]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

a depressed affect.  (Tr. 373).  There was no evidence of any agitation or hostility, or abnormal

thought process or thought content.  (Id.).  Plaintiff's insight and judgment appeared to be limited.

(Id.).  Dr. Lo diagnosed plaintiff with major depressive disorder, recurrent; rule out marijuana abuse;

with a current GAF score of 50[9] and the highest GAF score within the past year of 65.[10]  (Tr. 374).

Kyle DeVore, Ph.D, a state agency psychologist, performed a Psychiatric Review Technique

on February 23, 2009.  (Tr. 297-308).  Dr. DeVore diagnosed plaintiff with major depressive

disorder, borderline personality disorder, and anti-social personality disorder.[11]  (Tr. 300, 302).  Dr.

DeVore expressed the opinion that plaintiff's impairments caused mild limitations in plaintiff's

activities of daily living, and ability to maintain concentration, persistence, or pace; and moderate

limitations in plaintiff's ability to maintain social functioning.  (Tr. 305).  Dr. DeVore stated that

plaintiff was capable of performing simple to moderately complex tasks, and making simple work-

related decisions.  (Tr. 307).  Dr. DeVore noted that plaintiff may have difficulty getting along with

others.  (Id.).

Dr. DeVore also completed a Mental Residual Functional Capacity Assessment, in which he

---

[9]A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in
social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV at
32.  A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial
speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school
functioning (e.g., few friends, conflicts with peers or co-workers)."  Id. at 32.

[10]A GAF score of 61 to 70 denotes "[s]ome mild symptoms (e.g., depressed mood and
mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional
truancy, or theft within the household), but generally functioning pretty well, has some meaningful
interpersonal relationships."  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV),
32 (4th Ed. 1994).

[11]An enduring and pervasive pattern characterized by continuous and chronic antisocial
behavior with disregard for and violation of the rights and safety of others, beginning before the
age of 15.  Stedman's at 567.

expressed the opinion that plaintiff was moderately limited in his ability to work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others.  (Tr. 309-10).

On March 2, 2009, plaintiff was forty-five minutes late to his appointment.  (Tr. 369). Plaintiff reported that his mood was better and his sleep was better with Trazodone.  (Id.).  Dr. Lo found that plaintiff's mood was better and his affect was "reactive."  (Id.).  Plaintiff's mental status examination was normal, other than his insight and judgment appeared to be limited.  (Id.).  Dr. Lo increased plaintiff's dosage of Prozac to 80 mg. per day.  (Id.).

On April 27, 2009, plaintiff reported that his mood was better and his sleep was better with Trazodone.  (Tr. 367).  Plaintiff indicated that he was keeping busy helping a local politician's reelection campaign.  (Id.).  Dr. Lo described plaintiff's mood as "better" and his affect as "euthymia."  (Id.).  Plaintiff's insight and judgment were improved.  (Id.).  Dr. Lo assessed a current GAF score of 65.  (Id.).

On June 1, 2009, plaintiff reported that his mood, sleep, motivation, and energy were better. (Tr. 365).  Plaintiff was keeping busy helping others move and cutting grass.  (Id.).  Plaintiff expressed interest in going back to school for film-making and in finding a job in this area.  (Id.). Dr. Lo found that plaintiff's mood was "better," and his affect was "euthymia."[12]  (Id.).  Plaintiff's

---

[12]Joyfulness; mental peace and tranquility.  Stedman's at 679.

insight and judgment were improved.  (Id.).  Plaintiff's GAF score continued to be 65.  (Id.).

On August 3, 2009, plaintiff reported being robbed at gunpoint and losing all of his belongings and paperwork.  (Tr. 363).  Plaintiff reported some frustration and irritability, increased startle, and nightmares, although his mood, sleep, and energy were "ok."  (Id.).  Dr. Lo described plaintiff's mood as okay, and his affect as reactive.  (Id.).  Plaintiff's insight and judgment appeared to be fair.  (Id.).  Dr. Lo assessed a GAF score of 63.  (Id.).  She increased plaintiff's dosage of Prozac.  (Tr. 364).

On October 12, 2009, plaintiff reported that he had started school at St. Louis Community College in August, although he had recently gotten behind in homework due to poor time management skills and lack of motivation.  (Tr. 361).  Plaintiff was frustrated and concerned about whether he could make it.  (Id.).  Plaintiff also reported vivid nightmares involving physical fights during sleep, which frightened his girlfriend.  (Id.).  Dr. Lo described plaintiff's mood as "concerned," and his affect as "reactive."  (Id.).  Plaintiff's insight and judgment were fair.  (Id.).

Dr. Lo completed a Mental Medical Source Statement on October 12, 2009, in which she expressed the opinion that due to his diagnosis of major depressive disorder, plaintiff had marked[13] limitations in his ability to cope with normal stress, maintain reliability, interact with strangers or the general public, accept instructions or respond to criticism, maintain attention and concentration for extended periods, perform at a consistent pace without an unreasonable number and length of breaks, sustain an ordinary routine without special supervision, and respond to changes in work setting.  (Tr.

---

[13]"Marked" is defined as a limitation that "seriously interferes with the ability to function independently, appropriately, and effectively.  More than moderate, but less than extreme."  (Tr. 312).

- 9 -

312-13).   Dr. Lo found that plaintiff had moderate[14] limitations in his abilities to function independently behave in an emotionally stable manner, adhere to basic standards of neatness and cleanliness, relate to family and peers, interact with strangers or the general public, ask simple questions or request assistance, maintain socially acceptable behavior, and make simple and rational decisions.  (Id.).  Dr. Lo expressed the opinion that plaintiff could apply commonsense understanding to carry out simple one-or-two-step instructions six hours a day, interact appropriately with co-workers four hours a day, interact with supervisors four hours a day, and interact appropriately with the general public four hours a day.  (Tr. 314).  Dr. Lo found that plaintiff's symptoms would cause him to miss work and be late to work three times a month or more.  (Id.).  Dr. Lo indicated that plaintiff's limitations have existed at the assessed severity since youth.  (Tr. 315).

Plaintiff underwent drug testing on November 9, 2009 at the request of his attorney, which was negative.  (Tr. 375).

## C.   **Third Party Evidence**

Plaintiff's mother, Sybil Boyd, completed a Function Report Adult-Third Party on January 23, 2009.  (Tr. 132-40).  Ms. Boyd indicated that she lived with plaintiff, and that plaintiff slept late due to insomnia.  (Tr. 132).  Ms. Boyd noted that plaintiff's impairments affected his memory, and ability to understand, follow instructions, complete tasks, get along with others, and concentrate.  (Tr. 137).  Ms. Boyd stated that plaintiff has anger management problems and suffers from anxiety.  (Tr. 138).

---

[14]"Moderate" is defined as a "significant functional limitation that is more than minimal." (Tr. 312).

On February 22, 2009, Ms. Boyd, authored a letter on plaintiff's behalf.  (Tr. 152-54).  Ms. Boyd indicated that plaintiff was diagnosed with major depressive disorder at the age of twelve, at which time he was prescribed medication and underwent counseling.  (Tr. 152).  Ms. Boyd stated that plaintiff struggled to maintain jobs due to lack of concentration and depression.  (Tr. 153).

## The ALJ's Determination

The ALJ made the following findings:

1.   The claimant met the insured status requirements of the Social Security Act through December 31, 1996.

2.   The claimant has not engaged in substantial gainful activity since December 30, 2008, the alleged onset date (20 CFR404.1571 *et seq.* and 416.971 *et seq.*).

3.   The claimant has the severe impairment of major depressive disorder, and personality disorder (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the nonexertional limitations the claimant can understand, remember and carry out at least simple to moderately complex instructions and tasks, can demonstrate adequate judgment to make simple work-related decisions, can respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others is casual and infrequent, and should not work in a setting which includes constant/regular contact with the general public.

6.   The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on December 3, 1974 and was 34 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

- 11 -

8.      The claimant has a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from December 30, 2008 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 12-22).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits protectively filed on December 30, 2008, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act.

Based on the application for supplemental security income protectively filed on December 30, 2008, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

 (Tr. 22).

## Discussion

A.      Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from

- 12 -

the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

## B.    The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied.  See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)).  To qualify as severe, the

- 13 -

impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants

with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure must be followed at each level of administrative review.  See id.  Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758.  Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council.  See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent."  20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work:  activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A

and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.    **Plaintiff's Claims**

Plaintiff first argues that the ALJ failed to properly evaluate the medical opinion evidence. Plaintiff next argues that the ALJ erred in determining plaintiff's residual functional capacity.  Plaintiff finally argues that the ALJ erred in failing to evaluate third party evidence.  The undersigned will discuss plaintiff's claims in turn.

Plaintiff contends that the ALJ erred in discounting the opinion of plaintiff's treating psychiatrist Dr. Lo.  Plaintiff also argues that the ALJ failed to discuss or evaluate the opinion of the state agency psychologist Dr. DeVore.  In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'"  Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight."  Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Halala, 49 F.3d 374, 377 (8th Cir. 1995)). Further, a treating physician's opinion will typically be given controlling weight when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."  Prosch v. Apfel, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2) (bracketed material in original). Such opinions, however, do "not automatically control, since the record must be evaluated as a whole."  Id. at 1013 (quoting Bentley, 52 F.3d at 785-786).  Opinions of treating physicians may be

discounted or disregarded where other "medical assessments 'are supported by better or more thorough medical evidence.'" Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)).

Whatever weight the ALJ accords the treating physician's report, be it substantial or little, the ALJ is required to give good reasons for the particular weight given the report. See Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001). The ALJ, however, is not required to discuss every piece of evidence submitted. See Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir. 1998). If the opinion of a treating physician is not well supported or is inconsistent with other evidence, the ALJ must consider: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed, (3) the degree to which the physician's opinion is supported by the relevant evidence, (4) consistency between the opinion and the record as a whole, (5) whether or not the physician is a specialist in the area upon which an opinion is rendered, and (6) other factors which may contradict or support the opinion. See Rhodes, 40 F. Supp.2d at 1119; 20 C.F.R. § 404.1527 (d)(2)-(6).

Plaintiff first argues that the ALJ should have given controlling weight to the opinion of plaintiff's treating psychiatrist Dr. Lo. Dr. Lo completed a Mental Medical Source Statement on October 12, 2009, in which she expressed the opinion that plaintiff had marked limitations in his ability to cope with normal stress, maintain reliability, interact with strangers or the general public, accept instructions or respond to criticism, maintain attention and concentration for extended periods, perform at a consistent pace without an unreasonable number and length of breaks, sustain an ordinary routine without special supervision, and respond to changes in work setting. (Tr. 312-13). Dr. Lo found that plaintiff could apply commonsense understanding to carry out simple one-or-two-

step instructions six hours a day, interact appropriately with co-workers four hours a day, interact

with supervisors four hours a day, and interact appropriately with the general public four hours a day.

(Tr. 314). Dr. Lo found that plaintiff's symptoms would cause him to miss work and be late to work

three times a month or more. (Id.). Dr. Lo indicated that plaintiff's limitations have existed at the

assessed severity since youth. (Tr. 315).

The ALJ summarized Dr. Lo's treatment notes and Mental Medical Source Statement. (Tr.

15-17). The ALJ indicated that, on November 10, 2009, he sent a letter to Dr. Lo regarding her

medical source statement to determine whether additional information was available to clarify her

opinion, as it appeared to contain conflicts and could not be reconciled with the medical evidence of

record, including a positive drug test result. (Tr. 17). The ALJ noted that Dr. Lo responded to his

request by providing additional records, including copies of previous records and an additional

progress note dated October 12, 2009, but no further clarification. (Tr. 18). The ALJ stated that he

was affording "little weight" to Dr. Lo's medical source statement as it was not supported by her own

medical records and the GAF scores of 65. (Id.). The ALJ also noted that there was no basis for Dr.

Lo's finding that plaintiff's limitations have existed since youth, other than plaintiff's allegations.

(Id.).

The undersigned finds that the ALJ provided sufficient reasons for assigning "little weight"

to Dr. Lo's medical source statement. Opinions of treating doctors are not conclusive in determining

disability status and must be supported by medically acceptable clinical or diagnostic data. See

Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995). In this case, the ALJ found that Dr.

Lo's opinion was not supported by her own treatment notes. See Davidson v. Astrue, 578 F.3d 838,

842 (8th Cir. 2009) ("It is permissible for an ALJ to discount an opinion of a treating physician that

is inconsistent with the physician's clinical treatment notes.").

The ALJ first pointed out that the GAF scores assessed by Dr. Lo are inconsistent with the presence of marked limitations. At plaintiff's initial two visits with Dr. Lo in February and March of 2009, Dr. Lo assessed a GAF score of 50, but indicated that plaintiff's highest GAF score in the prior year was 65. (Tr. 374, 369). Plaintiff had been off his psychiatric medications for over a month when he first presented to Dr. Lo. (Tr. 372). On April 27, 2009, and June 1, 2009, Dr. Lo assessed a GAF score of 65. (Tr. 367, 365). On August 3, 2009, and October 12, 2009, Dr. Lo assessed a GAF score of 63. (Tr. 363, 361). Dr. Lo completed her Mental Medical Source Statement on October 12, 2009, the same day that she had seen plaintiff and assessed a GAF score of 63. (Tr. 312-13). A GAF score of 61 to 70 denotes "[s]ome mild symptoms" or "some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994). "While the Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' see 65 Fed.Reg. 50746, 50764-65, 2000 WL 1173632 (Aug. 21, 2000), the GAF scores may still be used to assist the ALJ in assessing the level of a claimant's functioning." Halverson v. Astrue, 600 F.3d 922, 930-31 (8th Cir. 2010) (quoting Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002)). The ALJ properly noted that GAF scores of 65 and 63 were inconsistent with the significant limitations found by Dr. Lo.

The remainder of Dr. Lo's treatment do not document serious symptoms that would support the finding of marked limitations. Dr. Lo consistently noted that plaintiff was cooperative, with normal speech, no evidence of any agitation or hostility, normal thought process, and normal thought content. (Tr. 373, 369, 367, 365, 363, 361). In April 2009, plaintiff reported that his mood and sleep

were better with medication. (Tr. 367). Plaintiff indicated that he was keeping busy helping a local politician's re-election campaign. (Id.). Dr. Lo noted that plaintiff's insight and judgment were improved. (Id.). In June 2009, plaintiff reported that his mood, sleep, motivation, and energy were better, and that he was keeping busy helping others move and cutting grass. (Tr. 365). Plaintiff also expressed interest in going back to school and in finding a job. (Id.). Dr. Lo found that plaintiff's affect was euthymic and his insight and judgment were improved. (Id.). In August 2009, plaintiff complained of frustration, irritability, and increased nightmares after being robbed at gunpoint and losing all of his belongings. (Tr. 363). Plaintiff's mood, sleep, and energy, however, were still "ok." (Id.). Dr. Lo increased plaintiff's dosage of Prozac. (Tr. 364). In October 2009, plaintiff reported that he had been attending school at the community college, although he had gotten behind in homework due to poor time management skill and lack of motivation. (Tr. 361). Plaintiff also complained of vivid nightmares and physical fights during his sleep, which frightened his girlfriend. (Id.). While Dr. Lo's treatment notes reveal plaintiff suffered from psychiatric symptoms, her records do not support the finding that plaintiff suffered from limitations that "seriously interfere[] with the ability to function independently, appropriately, and effectively." (Tr. 312).

The ALJ also stated that there was no basis for the finding that plaintiff's limitations have existed since youth, other than plaintiff's allegations. (Tr. 18). Plaintiff disputes this finding and argues that plaintiff's mother's statement supported the presence of psychiatric symptoms since plaintiff's youth. Plaintiff's mother indicated in a letter that plaintiff had been diagnosed with major depressive disorder at the age of twelve, and had difficulties since that time due to his mental illness. (Tr. 152-54). The ALJ did not discuss this evidence. Although it would be improper to discredit Dr. Lo's opinion solely due to her finding that plaintiff's limitations existed since youth, the ALJ also

found that Dr. Lo's opinion is inconsistent with her own treatment notes.  This finding is supported by the record.  As such, the ALJ provided sufficient reasons for discrediting Dr. Lo's opinion.

Plaintiff next contends that the ALJ erred in relying on the opinion of state agency psychologist Dr. DeVore in determining plaintiff's residual functional capacity without discussing the opinion.

The ALJ made the following determination regarding plaintiff's residual functional capacity:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the nonexertional limitations the claimant can understand, remember and carry out at least simple to moderately complex instructions and tasks, can demonstrate adequate judgment to make simple work-related decisions, can respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others is casual and infrequent, and should not work in a setting which includes constant/regular contact with the general public.

(Tr. 14).

Determination of residual functional capacity ("RFC") is a medical question and at least "some medical evidence 'must support the determination of the claimant's [RFC] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'"  Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)).  Further, determination of RFC is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'"  Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).  Similarly, in making a finding of RFC, an ALJ may consider non-medical evidence, although the RFC finding must be supported by *some* medical evidence.  See Lauer, 245 F.3d at 704.

The ALJ provided no explanation for his RFC determination.  As previously discussed, the

- 21 -

ALJ indicated that he was assigning little weight to Dr. Lo's opinion. The ALJ did not discuss any other opinion evidence.

The RFC formulated by the ALJ is consistent with the opinion of state agency psychologist Kyle DeVore. Dr. DeVore performed a Psychiatric Review Technique on February 23, 2009, in which he diagnosed plaintiff with major depressive disorder, borderline personality disorder, and anti-social personality disorder. (Tr. 300, 302). Dr. DeVore expressed the opinion that plaintiff's impairments caused mild limitations in plaintiff's activities of daily living, and ability to maintain concentration, persistence, or pace; and moderate limitations in plaintiff's ability to maintain social functioning. (Tr. 305). Dr. DeVore stated that plaintiff was capable of performing simple to moderately complex tasks, and making simple work-related decisions. (Tr. 307). Dr. DeVore noted that plaintiff may have difficulty getting along with others. (Id.).

As plaintiff points out, the ALJ did not discuss Dr. DeVore's opinion or indicate the weight he was assigning to the opinion. The ALJ, however, appeared to rely on this opinion in determining plaintiff's residual functional capacity RFC. Plaintiff argues that the ALJ erred in failing to explain the weight given to the opinion of Dr. DeVore. Plaintiff cites the Commissioner's regulations, 20 C.F.R. § 404.1527(f)(2)(ii) and Willcockson v. Astrue, 540 F.3d 878, 880 (8th Cir. 2008), as support for this claim.

In Willcockson, the Eighth Circuit found that the ALJ erred by implicitly relying on the residual functional capacity assessment of a non-examining state agency medical consultant without explaining the weight given to the opinion. 540 F.3d at 880. The Eighth Circuit noted that an explanation would have been "particularly helpful" in that case, due to a seventeen-month gap between the assessment and the hearing, during which the claimant received additional medical

treatment that the consultant could not have known about.  Id.  The Eighth Circuit held as follows:

> [t]hough we think the question is close, we conclude that we must remand because we cannot determine from the written decision whether the ALJ properly reviewed the evidence.  Several errors and uncertainties in the opinion, that individually might not warrant remand, in combination create sufficient doubt about the ALJ's rationale for denying [plaintiff]'s claims to require further proceedings below.

Id. at 879-880.

The undersigned finds that the ALJ's assessment of plaintiff's residual functional capacity is not supported by substantial evidence.  The ALJ did not provide any support for his determination. The ALJ assigned little weight to the opinion of plaintiff's treating psychiatrist, Dr. Lo.  Significantly, Dr. Lo found that plaintiff had many marked limitations, which the vocational expert indicated would be disabling.  (Tr. 22).  While the ALJ provided valid reasons for questioning Dr. Lo's opinion, the ALJ appears to rely on the opinion of a non-examining state agency psychologist, without explaining the weight given to this opinion.  Where, as here, an ALJ does not give controlling weight to the opinion of a treating source , but rather relies upon the opinion of a state agency physician, the Commissioner's regulations require the ALJ to explain the weight given to the consultant.  See 20 C.F.R. § 404.1527(f)(2)(ii).  Notably, the state agency psychologist, Dr. DeVore, provided his opinion in February 2009, eight months prior to Dr. Lo's opinion and nine months prior to the hearing.  As such, Dr. DeVore did not have the benefit of any of Dr. Lo's treatment notes other than plaintiff's initial evaluation, or Dr. Lo's medical source statement.  No other physician provided an opinion regarding plaintiff's ability to work with his mental impairments.

In addition, as plaintiff points out, the ALJ failed to consider third party evidence in determining plaintiff's residual functional capacity.  Specifically, the ALJ failed to mention third party evidence from plaintiff's mother, Sybil Boyd.  In a letter dated February 22, 2009, Ms. Boyd indicated

that plaintiff was diagnosed with major depressive disorder at the age of twelve, at which time he was prescribed medication and underwent counseling. (Tr. 152). Ms. Boyd stated that plaintiff struggled to maintain jobs due to lack of concentration and depression. (Tr. 153). Ms. Boyd indicated that plaintiff tested gifted throughout his school career, but his mental illness prevented him from attending college. (Tr. 154). Ms. Boyd also completed a Function Report Adult-Third Party, in which she stated that she lived with plaintiff, and that plaintiff slept late due to insomnia. (Tr. 132). Ms. Boyd indicated that plaintiff's impairments affected his memory, and ability to understand, follow instructions, complete tasks, get along with others, and concentrate. (Tr. 137). Ms. Boyd also noted that plaintiff had anger management problems and suffered from anxiety. (Tr. 138).

The ALJ did not discuss the opinion of Ms. Boyd. The Eighth Circuit Court of Appeals has criticized the failure of an ALJ to consider subjective testimony of the family and others. See e.g., Smith v. Heckler, 735 F.2d 312, 317 (8th Cir. 1984); Basinger v. Heckler, 725 F.2d 1166, 1169-70 (8th Cir. 1984); Willcockson, 540 F.3d at 880. Failure to consider third party evidence does not, however, always require remand. See, e.g. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992) (remand not required when it had no effect on the outcome of the case because witness's testimony is discredited by the same evidence that proves claimant's claims not credible); Lorenzen v. Chater, 71 F.3d 316, 319 (8th Cir. 1995) (same).

In this case, Ms. Boyd's testimony supports the presence of a mental impairment since plaintiff was twelve years of age. This is significant because the ALJ discredited the opinion of Dr. Lo, in part, because he found there was no basis for the finding that plaintiff's limitations have existed since youth, other than plaintiff's allegations. (Tr. 18). As such, the ALJ erred in failing to discuss this evidence.

- 24 -

## Conclusion

In sum, the ALJ erred in failing to indicate the weight he was assigning to the opinion of the non-examining state agency physician while implicitly relying on this opinion after rejecting the opinion of plaintiff's treating physician that plaintiff had disabling work-related limitations.  The ALJ also erred in failing to discuss third party testimony from plaintiff's mother.  While "the question is close," the court believes that, due to a number of errors casting doubt about the ALJ's rationale for denying plaintiff's claim, reversal and remand are required.  Willcockson, 540 F.3d at 879-880.  For these reasons, this cause will be reversed and remanded to the ALJ in order for the ALJ to properly consider the third party evidence;  indicate the weight he is assigning to the opinion of the state agency psychologist; and formulate a new residual functional capacity for plaintiff based on the medical evidence in the record and, if necessary, obtain additional evidence addressing plaintiff's ability to function in the workplace; and then to continue with the next steps of the sequential evaluation process.  Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

Dated this   10th   day of February, 2012.

_Lewis M. Blanton_

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE